839 A.2d 134 (2004)
365 N.J. Super. 378
Raymond PINTO, Jr., Plaintiff-Respondent,
v.
NEW JERSEY MANUFACTURERS INSURANCE COMPANY, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued November 10, 2003.
Decided January 21, 2004.
*136 Glenn T. Dyer, argued the cause for appellant (Connell Foley, attorneys; Brian G. Steller, of counsel, Roseland; Mr. Dyer, on the brief).
John M. Vlasac, Jr., argued the cause for respondent (Gill & Chamas, attorneys, Woodbridge; Mr. Vlasac, on the brief).
Before Judges HAVEY, FALL and HOENS.
*135 The opinion of the court was delivered by FALL, J.A.D.
The issue posed by this appeal is whether the underinsured motorists (UIM) benefits claim of an employee, injured while operating a motor vehicle owned and insured by his employer, is effectively reduced by the "step-down" coverage clause contained in the UIM endorsement of the employer's business auto policy to the limit of UIM coverage contained in the employee's personal auto policy when that employee is listed as an individual "named insured" in his personal auto policy but is not listed as an individual named insured under the employer's business auto policy.
Here, plaintiff Raymond Pinto, Jr. was injured in an auto accident while operating a vehicle owned by his employer that was insured by defendant New Jersey Manufacturers Insurance Company (NJM) under a business auto policy. The NJM policy contained a $1 million UM/UIM coverage limit, and a step-down clause in its UM/UIM endorsement that limited UM/UIM claims to the UM/UIM coverage limit contained in any other policy having similar coverage that listed the claimant as an individual named insured when that claimant was not an individual named insured under the NJM policy. The tortfeasor's auto policy had $300,000 in auto liability coverage. Plaintiff had a personal auto policy naming him as a named insured with $100,000 in UIM coverage.
We conclude that because plaintiff was a "named insured" under his personal auto policy and was not a named insured under his employer's business auto policy issued by NJM, his claim for UIM coverage under the business auto policy was limited by the step-down clause contained in that policy's UM/UIM endorsement to the amount of UIM coverage he elected in his personal auto policy. We find the language of the step-down, coverage-limitation clause to be clear, unambiguous and uncontroverted by any other provisions contained in the business auto policy issued by NJM. Furthermore, because the limit of liability coverage contained in the tortfeasor's policy exceeded the limit of UIM coverage contained in plaintiff's personal auto policy, plaintiff was not an "underinsured motorist" as defined in the NJM policy. We therefore reverse the November 22, 2002 order entered in the Law Division that had granted summary judgment in favor of plaintiff and remand for entry of judgment in favor of NJM on the UIM coverage issue.
In reaching these conclusions, we discern no bright-line test or rule for determining competing UIM claims in the context of multiple policies that contain UIM *137 coverage. The critical factor in resolving competing claims for UIM coverage is the language of the policies. If clear, unambiguous and uncontroverted by any other provisions contained in the policy, courts should apply the policy language to the peculiar facts and circumstances of each case in determining coverage issues.
In this case, the following factual and procedural history is relevant to our consideration of the arguments advanced on appeal. Plaintiff was employed by R.W. Vogel, Inc. (Vogel). Environmentally Clean Naturally, Inc. (ECN) was engaged in a street-cleaning project on the northbound lanes of Route 9 in Howell Township pursuant to its subcontract with Reilly Sweeping, Inc. Because of a manpower shortage, ECN prevailed upon Vogel to work on the street-cleaning job. On December 22, 1997, plaintiff was driving the lead truck in a three-vehicle street-cleaning convoy. The vehicle being operated by plaintiff was owned by Holgate Property Associates (Holgate), another company owned and operated by the owners of Vogel, and had been rented by ECN.
At that time and place, a Ford Expedition vehicle being operated by Theresa Trotter struck plaintiff's vehicle from the rear, resulting in severe personal injuries to plaintiff. The Trotter vehicle was insured by New Jersey Re-Insurance Company, which provided liability coverage of $300,000 on a combined, single-limit basis.
Plaintiff was a "named insured" under a personal auto policy he had purchased from Liberty Mutual/Liberty Guard (Liberty Mutual), under which he had selected UM/UIM coverage protection in the amount of $100,000 per person and $300,000 per accident. Vogel and Holgate were "named insureds" under the business auto policy issued by NJM which provided UIM coverage limits of up to $1 million. At the time of the December 22, 1997 accident, the NJM business auto policy identified no natural persons as "named insureds."
The NJM business auto policy contained a "step-down" clause in the policy's UM/UIM endorsement, limiting its UIM coverage to "the highest applicable limit of insurance under any coverage form or policy providing coverage to that insured as an individual named insured." Plaintiff filed a claim with NJM, seeking UIM coverage for his injuries up to the policy limit of $1 million. NJM denied coverage based upon the step-down clause in its policy pertaining to UIM coverage.
The following appeared on the first page of the NJM business auto policy in effect at the time of the December 22, 1997 accident:
BUSINESS AUTO COVERAGE FORM
Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.
Throughout this policy the words you and your refer to the Named Insured shown in the Declarations. The words we, us, and our refer to the Company providing this insurance.
Under its policy, NJM agreed to "pay all sums the insured [was] legally entitled to recover as compensatory damages from the owner or driver of an uninsured motor vehicle or an underinsured motor vehicle[.]" The definition of "insured" includes "[a]nyone else occupying a covered auto[.]"
The step-down clause in dispute in the NJM business auto policy provided in pertinent part:
D. LIMIT OF INSURANCE
1. Regardless of the number of covered autos, insureds, premiums paid, *138 claims made or vehicles involved in the accident, the LIMIT OF INSURANCE shown in the Declarations for Uninsured Motorists Coverage and Underinsured Motorists Coverage is the most we will pay for all damages resulting from any one accident with an uninsured motor vehicle or an underinsured motor vehicle.
a. However, subject to our maximum Limit Of Insurance for this coverage, if:
(1) An insured is not the individual named insured under this policy;
(2) That insured is an individual named insured under one or more other policies providing similar coverage; and
(3) All such other policies have a limit of insurance for similar coverage which is less than the Limit Of Insurance for this coverage;
then the most we will pay for all damages resulting from any one accident with an uninsured motor vehicle or an underinsured motor vehicle shall not exceed the highest applicable limit of insurance under any coverage form or policy providing coverage to that insured as an individual named insured.
Section F.4 of the NJM policy contained the following definition of an "underinsured motor vehicle:"
4. Underinsured motor vehicle means the following:
a. With respect to an insured who is:
(1) Not the individual named insured under this policy, and
(2) An individual named insured under one or more other policies providing similar coverage,
underinsured motor vehicle means a land motor vehicle or trailer of any type to which a liability bond or policy applies at the time of an accident but its limit of liability is less than the highest applicable limit of liability under any coverage form or policy providing coverage to that insured as an individual named insured.
The insurance needs of Vogel and Holgate were handled by insurance brokerage companies with which Arthur Nelson and Karen Jessie were associated. Jessie was employed by Capacity Coverage Company, Vogel's broker. Nelson had several conversations with Roger Vogel (Roger) about the Vogel/Holgate business automobile policy, which usually took place when Nelson would attempt to convince Roger to consider quotes from other insurers. "[S]ometime around" 1996, Nelson specifically discussed with Vogel how the UM/UIM provision of the business auto policy worked. At the time of this conversation, NJM had changed its UM/UIM coverage to include the subject step-down coverage clause. Roger understood the UM/UIM coverage changes, he was happy with NJM and he wanted to stay with the company.
In August 1997, Jessie placed a renewal policy with NJM without either Capacity Coverage Company or the insureds having completed and returned the yearly commercial automobile renewal questionnaire (which NJM had provided to Jessie in early July 1997, a month before the renewal policy took effect), or discussing the policy with NJM. On July 24, 1997, NJM had written to Jessie again and asked that she "carefully review the enclosed contract for accuracy" in light of the absence of a completed questionnaire. In both July letters, NJM offered to meet with Jessie or the insureds at any time to discuss the policy.
Enclosed with NJM's July 24th letter was a document called "IMPORTANT CHANGES IN YOUR AUTO INSURANCE POLICY." One of the changes was identified and described as follows:

*139 A NEW COVERAGE RESTRICTION

Other Insurance: The "Other Insurance" section of NJM's Uninsured and Underinsured Motorists Coverage now imposes a limit on the total damages that an NJM policyholder can recover if he or she is injured in an accident and more than one policy can provide Uninsured and Underinsured Motorists Coverage. Under the new limit, the injured person can receive no more than the highest applicable limit provided by any one policy, either on a primary or excess basis.
Plaintiff never reviewed nor inquired about any business auto policy insuring Vogel or Holgate. At no time prior to the accident did plaintiff have any understanding of the coverages, terms, conditions, or limitations contained in Vogel's and Holgate's business auto policy with NJM.
The parties disagree over whether plaintiff was acting within his duties as a Vogel employee at the time of the accident and whether the GMC truck being operated by plaintiff was owned and insured by Vogel and Holgate, or simply Vogel. However, this factual dispute is not material because the truck was clearly insured by the NJM policy, and NJM did not disclaim coverage on the grounds that plaintiff was not acting in the course of employment or that he was employed by an entity to which the business auto policy did not apply.
On or about December 26, 2001, plaintiff filed a declaratory judgment complaint in the Law Division against NJM, seeking an order requiring NJM to provide him with UIM coverage up to the $1 million limit in the Vogel business auto policy. NJM answered, contending that the step-down clause contained in the UM/UIM endorsement of its policy with Vogel limited plaintiff's coverage to the UIM policy limit in plaintiff's personal automobile policy with Liberty Mutual, under which plaintiff was a "named insured." After discovery was completed, the parties filed cross-motions for summary judgment.
The motions were argued in the Law Division on November 22, 2002. Citing to the rationale set forth in Macchi v. Connecticut Gen. Ins. Co., 354 N.J.Super. 64, 804 A.2d 596 (App.Div.), certif. denied, 175 N.J. 79, 812 A.2d 1111 (2002), and Araya v. Farm Family Cas. Ins. Co., 353 N.J.Super. 203, 801 A.2d 1194 (App.Div.), certif. denied, 175 N.J. 77, 812 A.2d 1109 (2002), the motion judge denied NJM's motion, and granted summary judgment in favor of plaintiff. Although the record is not clear, apparently the motion judge had concluded that the UIM coverage provided by NJM would be "illusory" if denied to plaintiff because the "named insured" under its policy was a business entity, not a natural person, and an entity could not sustain personal injuries. Under that rationale, plaintiff would be considered a "named insured" under the NJM business auto policy, entitled to compensation for his injuries up to the full limit of its UIM coverage.
On appeal, NJM presents the following argument for our consideration:
NJM IS ENTITLED TO REVERSAL AND JUDGMENT IN ITS FAVOR SINCE THE TRIAL COURT ERRED WHEN IT DETERMINED THAT PLAINTIFF MAY PURSUE UNDERINSURED MOTORIST COVERAGE UNDER THE NJM BUSINESS AUTO POLICY.
We begin our analysis of this argument with a review of well-established principles involving the construction of insurance policies. When the terms of an insurance contract are clear, they will be enforced as written. Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 245-50, 405 A.2d 788, 794-96 (1979); Botti v. CNA Ins. Co., *140 361 N.J.Super. 217, 225, 824 A.2d 1120, 1124-25 (App.Div.2003); Christafano v. New Jersey Mfrs. Ins. Co., 361 N.J.Super. 228, 235, 824 A.2d 1126, 1130-31 (App.Div. 2003). However, because insurance contracts are contracts of adhesion, ambiguous language will be construed liberally and resolved against the insurer and in favor of coverage. Botti, supra, 361 N.J.Super. at 224, 824 A.2d at 1124; Christafano, supra, 361 N.J.Super. at 234, 824 A.2d at 1130. "A `genuine ambiguity' exists only `where the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage.'" Botti, supra, 361 N.J.Super. at 224, 824 A.2d at 1124 (quoting Weedo, supra, 81 N.J. at 247, 405 A.2d at 795).
Thus, when an insurance policy "does not make clear its intention to exclude a class of claimants or claims otherwise allowed thereunder, coverage will be found to exist," Botti, supra, 361 N.J.Super. at 224-25, 824 A.2d at 1124, so as "to comport with the insured's objectively reasonable expectations of coverage." Christafano, supra, 361 N.J.Super. at 234, 824 A.2d at 1130.
N.J.S.A. 17:28-1.1 governs UM/UIM coverage. Specifically, all motor vehicle liability policies, except for basic automobile insurance policies, must include minimum UM coverage. N.J.S.A. 17:28-1.1(a). Although insurers must offer UIM coverage to their policyholders, the statute does not require any motor vehicle liability policy to include UIM coverage. Ibid.; N.J.S.A. 17:28-1.1(b); Aubrey v. Harleysville Ins. Cos., 140 N.J. 397, 404, 658 A.2d 1246, 1250 (1995). In determining when a vehicle is considered to be underinsured the statute provides, in pertinent part:
A motor vehicle is underinsured when the sum of the limits of liability under all bodily injury and property damage liability bonds and insurance policies available to a person against whom recovery is sought for bodily injury or property damage is, at the time of the accident, less than the applicable limits for underinsured motorist coverage afforded under the motor vehicle insurance policy held by the person seeking that recovery. A motor vehicle shall not be considered an underinsured motor vehicle under this section unless the limits of all bodily injury liability insurance or bonds applicable at the time of the accident have been exhausted by payment of settlements or judgments. The limits of underinsured motorist coverage available to an injured person shall be reduced by the amount he has recovered under all bodily injury liability insurance or bonds[.]

[N.J.S.A. 17:28-1.1(e).]
Thus, "the statute states that the determination whether a vehicle is underinsured requires ascertaining whether the liability limits of the person `against whom recovery is sought' are `less than' the amount of UIM coverage `held by the person seeking that recovery.'" Aubrey, supra, 140 N.J. at 403, 658 A.2d 1246. Here, applying the criteria contained in N.J.S.A. 17:28-1.1(e) in light of the step-down coverage clause of the NJM business auto policy, the tortfeasor Trotter's vehicle could not be considered as an "underinsured" vehicle because the liability limit of her policy ($300,000) exceeded the UIM coverage limits of plaintiff's personal auto policy ($100,000). Conversely, if the step-down clause is deemed inapplicable, then the tortfeasor's vehicle would be statutorily considered an underinsured vehicle because the NJM UIM policy limit ($1 million) exceeded the liability limits on the tortfeasor's policy with New Jersey Re-Insurance Company.
In evaluating the soundness of our conclusion that the step-down coverage in the UM/UIM endorsement contained in NJM's *141 business auto policy limits plaintiff's recovery of UIM benefits to that limit of UIM coverage provided in his personal auto policy, we must embark upon a review and analysis of the evolving and relevant jurisprudence in the area of UIM coverage when there are multiple policies containing UIM coverage under which a claimant is considered to be an "insured."
In Aubrey, supra, 140 N.J. at 403, 658 A.2d at 1250, the Court concluded "that UIM coverage, which is limited to the amount contained in the insured's policy, is `personal' to the insured[,]" and that UIM "[c]overage is linked to the injured person, not the covered vehicle." Ibid. Therefore, the Court concluded that "[t]he right to recover UIM benefits depends on the UIM limits chosen by the insured." Id. at 405, 658 A.2d at 1251. In Aubrey, the plaintiff was injured in a three-car accident while driving a vehicle loaned to her by an automobile dealer. The dealer had insured its vehicles through a garage policy issued by the defendant, which contained a UIM coverage limit of $1 million. Id. at 399-400, 658 A.2d at 1248. The plaintiff received $40,000 by settling for the liability limits of the tortfeasors' insurance policies. Id. at 400, 658 A.2d at 1248. The plaintiff's personal auto policy provided $15,000 in UIM coverage. Ibid. Therefore, under the terms of plaintiff's personal auto policy, she was not "underinsured[,]" ibid., because the amounts recovered from the tortfeasors' policies exceeded the amount of UIM coverage under her personal auto policy.
However, the plaintiff sought access to the $1 million in UIM coverage limit contained in defendant's garage policy. Ibid. The defendant denied coverage, claiming that the plaintiff's UIM coverage was limited to that set forth in her own policy. Ibid. The Court agreed, concluding that limiting UIM coverage to that contained in the plaintiff's personal auto policy comported with the plaintiff's reasonable expectations, since she could not have reasonably anticipated the possibility of receiving benefits under the UIM endorsements issued by the automobile dealer's carrier when she purchased her UIM coverage under her personal auto policy. Id. at 404, 658 A.2d at 1250.
Because UIM coverage is discretionary, the Court reasoned that "a `purchaser would reasonably and objectively expect that he is buying such protection up to the declared limits primarily for himself and his resident spouse.'" Ibid. (quoting Clegg v. N.J. Auto. Full Underwriting Ass'n, 254 N.J.Super. 634, 640, 604 A.2d 179, 182 (App.Div.1992)). Stated another way, "[t]he right to recover UIM benefits depends on the UIM limits chosen by the insured. Recovery does not depend on the limits of other UIM policies[.] ..." Id. at 405, 658 A.2d at 1251.
In addition, the liability section of the garage policy in Aubrey contained a step-down clause that limited the recovery of a customer of the automobile dealer to $15,000, the statutory minimum. Id. at 401, 658 A.2d at 1249. The defendant's UIM endorsement did not contain a step-down clause, but defined "insured" to include any person "occupying a covered auto." Ibid. The Court noted, however, that the parity provision of N.J.S.A. 17:28-1.1(b) "states that an insured's UIM coverage `shall not exceed the insured's motor vehicle liability policy limits....'" Ibid. The Court concluded that the plaintiff could not be considered "underinsured" under defendant's UIM endorsement because the plaintiff's right to recovery was limited to the statutory minimum of $15,000 by the parity provision of N.J.S.A. 17:28-1.1(b) and the step-down clause, which amount was exceeded by the $40,000 *142 recovered from the tortfeasors. Id. at 406, 658 A.2d at 1251.
In Taylor v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 289 N.J.Super. 593, 598, 674 A.2d 634, 636-37 (App.Div.), certif. denied, 145 N.J. 376, 678 A.2d 716 (1996), and Cook-Sauvageau v. The PMA Group, 295 N.J.Super. 620, 622, 685 A.2d 978, 979 (App.Div.1996), certif. denied, 150 N.J. 29, 695 A.2d 671 (1997), we expressly rejected the proposition that Aubrey limited a claimant's eligibility for and entitlement to UIM coverage only to that provided in his or her personal auto policy in circumstances when the claimant also was entitled to UIM coverage under another applicable policy. The policies in Taylor and Cook-Sauvageau did not contain step-down provisions.
In Taylor, supra, the plaintiff was injured while driving a vehicle provided for his personal use by his employer. 289 N.J.Super. at 595, 674 A.2d at 635. The plaintiff was a "named insured" on the employer's policy issued by the defendant covering that vehicle. Ibid. The tortfeasor's liability limit was $100,000. Id. at 596, 674 A.2d at 635-36. The plaintiff's personal auto policy provided $100,000 in UIM coverage. Ibid. The employer's business auto policy issued by defendant provided UIM coverage in the amount of $250,000 per person and $500,00 per accident. Id. at 601, 674 A.2d at 638. Even though the plaintiff in Taylor was not deemed underinsured under his personal auto policy, he was considered underinsured under the business auto policy issued to his employer by the defendant because the plaintiff was a "named insured" under that policy for his use of the employer's vehicle. Id. at 599-600, 674 A.2d at 637.
In Cook-Sauvageau, supra, the issue presented was "whether an employee who is injured while operating his or her employer's motor vehicle during the course of employment is entitled to the [UIM] coverage provided under the employer's business automobile policy or is subject to the limits of such coverage provided under the employee's own personal automobile policy." 295 N.J.Super. at 622, 685 A.2d at 979. There, the tortfeasor's liability coverage was limited to $15,000; the plaintiff's personal auto policy provided $50,000 in UIM coverage; and the employer's business auto policy provided $1 million in UIM coverage "to anyone occupying a covered auto," including employees. Ibid.
The plaintiff settled for the $15,000 limit of the tortfeasor's liability policy. Id. at 622-23, 685 A.2d at 979-80. Thereafter, the employer's business auto carrier sent the plaintiff's lawyer a letter confirming that its policy was primary, took the plaintiff's statement under oath, and obtained his medical records. Id. at 623, 685 A.2d at 980. However, after Aubrey was decided, the employer's carrier reversed its position, claiming that the plaintiff was only entitled to the UIM coverage provided for in his personal policy. Ibid.
The plaintiff filed a declaratory judgment action and sought an order directing the business auto carrier to show cause why an arbitrator should not be appointed to determine the amount of UIM benefits to which the plaintiff was entitled under its policy. Ibid. The trial court ruled that the plaintiff was entitled to UIM coverage under the business auto policy because the availability of such coverage was the reasonable expectation of both employer and employee, and "`when a corporate entity is the insured, the personal injury coverage can only apply to its individual employees.'" Ibid. (quoting the trial court's decision). We affirmed. Id. at 628, 685 A.2d at 982.
We first observed that, although the UM/UIM statute only prescribed the *143 amount of UIM coverage that an insurer was required to offer, the insurer was "free to offer broader UIM coverage than what is statutorily mandated." Id. at 624, 685 A.2d at 980. There, even though the insurer had been statutorily obligated to offer the plaintiff's employer $500,000 of UIM coverage, the insurer chose to offer $1 million. Ibid. We held that "so long as the statutorily mandated coverage has been offered, the scope of the UIM benefits provided under an automobile liability policy is determined by the language of the policy and the reasonable expectations of the persons insured thereunder." Ibid.
Noting that Aubrey "involved a rather unusual factual situation[,]" we concluded that Aubrey did "not stand for the proposition that only the purchaser of an automobile insurance policy may recover UIM benefits." Id. at 625, 685 A.2d at 981. We observed that in Taylor we had ruled that the employee was entitled to coverage under the business auto policy because he was a specifically named insured on the policy. Id. at 626, 685 A.2d at 981. Even though the plaintiff in Cook-Sauvageau had not been named on the employer's policy, we ruled that "the essential risk for which [the insurer]'s business automobile policy was intended to provide coverage was an accident involving an employee's operation of one of the employer's vehicles." Id. at 627, 685 A.2d at 982. We held that the UIM coverage in the business auto policy in Cook-Sauvageau applied to "any person occupying a covered auto," which clearly included someone in the plaintiff's position. Ibid. Although an employee's own policy might also provide UIM coverage, we held that the "other insurance" clause in standard automobile policies rendered the employer's UIM coverage primary, and the employee's coverage secondary. Ibid. We concluded:
Consequently, it would be manifestly inconsistent with the plain language of the UIM endorsement of [the insurer]'s business automobile policy and with the reasonable expectations of both the employer and employee to deny the benefits of UIM coverage to an employee injured while operating one of the employer's vehicles during the course of employment.

[Ibid.]
We also noted that if the UIM provision of the standard business auto policy was construed to cover only the employer, "the premium paid for UIM coverage would not provide any meaningful benefit either to the employer or to its employees[,]" ibid., because a corporate employer cannot itself suffer bodily injury and, therefore, could not maintain an UIM claim unless its collision coverage was insufficient to cover the property damage sustained by the vehicle. Id. at 627-28, 685 A.2d at 982. Yet, if the endorsement was construed to provide coverage to the employer's employees, then it would provide a financial benefit not only to the employees but also to the employer. Id. at 628, 685 A.2d at 982. Relying on the plain language of the UIM endorsement and "other insurance" clause of the business auto policy, as well as the reasonable expectations of the employer and employee, we concluded that the plaintiff was entitled to UIM coverage under his employer's business automobile policy. Ibid.
Our reasoning in Taylor and Cook-Sauvageau was approved by the Court in French v. New Jersey School Bd. Ass'n Ins. Group, 149 N.J. 478, 694 A.2d 1008 (1997). There, the Court considered an employee's right to recover UIM benefits under her employer's policy rather than her personal automobile insurance policy. Id. at 480, 694 A.2d at 1009. In French, the plaintiff, a Hudson County Area Vocational Technical School bus driver, was severely injured when the bus she was *144 driving was struck from the rear by a taxi cab. Ibid. Her claim against the taxi company was settled for the full $25,000 liability limit of its policy. Id. at 481, 694 A.2d at 1009.
The plaintiff's personal auto policy provided for UIM coverage in the amount of $25,000. Ibid. Plaintiff sought recovery under the school's policy, which provided for $1 million in UIM coverage. Ibid. Citing to Aubrey, the trial court limited any UIM recovery that the plaintiff might receive to the $25,000 available under her personal auto policy. Ibid. Because the plaintiff's UIM coverage equaled the tortfeasor's liability coverage, she was not deemed to be "underinsured," and summary judgment was granted in favor of the school's insurer. Ibid. We affirmed. Ibid. The Supreme Court reversed. Ibid.
The Court held "that when an automobile accident occurs in the course of employment, a policy `held' by a regular employee of a business enterprise includes the policy of the enterprise that covers the employee in the course of employment." Ibid. Citing to N.J.S.A. 17:28-1.1(e), the Court stated that "[a] motor-vehicle tortfeasor is `underinsured' only when all the liability coverage insuring his or her purportedly underinsured vehicle is less than the UIM benefits `held' by the UIM claimant." Id. at 483, 694 A.2d at 1010.
Concluding that its decision in Aubrey had been misconstrued, the Court ruled that its interpretation in Aubrey of the word "held" in N.J.S.A. 17:28-1.1(e) had referred to the "UIM policy actually purchased by or purchased for the benefit of the prospective UIM claimant" and that the facts in Aubrey illustrated that the Court "did not expect or intend that the amount of liability held under a personal insurance policy would be the sole criterion or litmus test for determining UIM coverage issues." French, supra, 149 N.J. at 485-86, 694 A.2d at 1012. More specifically, the Court explained:
[W]e note the problem that Aubrey has apparently been interpreted by some courts as establishing the UIM policy purchased by the injured person as not only the policy of "comparison" (for the purpose of gauging whether a UIM claim exists in the first place) but also as the only UIM policy that the injured person has resort to once the threshold test is met. That is simply too broad a reading. Indeed, other portions of the statute and the standard uninsured/ underinsured motorist endorsement approved by the Commissioner of Insurance plainly envision one potentially being able to secure benefits under more than one UIM endorsement.
[Id. at 486, 694 A.2d at 1012.]
The Court noted that N.J.S.A. 17:28-1.1(c), which prohibits the stacking of UM and UIM coverage, contemplated that one could be a named insured under multiple policies with UIM coverage. Id. at 486-87, 694 A.2d at 1012. In addition, the standard UM/UIM endorsement definition of an "insured," which had been approved by the Commissioner of Insurance for use in personal automobile insurance policies, contemplated situations where "one could conceivably receive benefits under more than one UIM policy." Id. at 487, 694 A.2d at 1012. The Court ruled that if the "only trigger to UIM coverage were the limits `chosen' by an injured person, a broad class of victims such as those who did not own or did not drive automobiles would be entirely excluded from UIM coverage." Ibid. Because the Legislature could not have intended that these individuals would not receive any UIM benefits under the host vehicle's policy, "a policy `held' by a claimant is not always a policy purchased by a claimant." Ibid. "Others *145 may provide coverage for the claimant." Ibid.
The Court observed that even after Aubrey, "insurance companies seemed to assume that an employer's UIM policy would cover an employee for work-connected injuries, although there might be a dispute about whether the employer's policy or the personal policy would be primary." French, supra, 149 N.J. at 487, 694 A.2d at 1012. Citing to Cook-Sauvageau and Taylor with approval, the Court noted that the essential risk for which the carrier's business auto policy was intended to provide coverage was an accident involving an employee's operation of one of the employer's vehicles. Id. at 488, 694 A.2d at 1013.
Thus, the Court found that it would be "manifestly inconsistent" with the plain language of the UIM endorsement in the business automobile policy, as well as the reasonable expectations of the employer and the employee, to deny UIM coverage under the business auto policy to an employee who is injured while driving one of the employer's vehicles during the course of employment. Id. at 489, 694 A.2d at 1013.
Again, it is critical to our analysis here that the business auto policies in French; Cook-Sauvageau, and Taylor did not contain step-down clauses in their UM/UIM business auto policy endorsements. In two subsequent decisions, the Court further considered UIM coverage in the context of multiple insurance policies. These decisions, in dicta, reflect the Court's tacit approval of step-down coverage limitation clauses and the definition of an "underinsured motor vehicle" similar to those contained in the NJM policy at issue here.
In Magnifico v. Rutgers Cas. Ins. Co., 153 N.J. 406, 710 A.2d 412 (1998), the plaintiff was injured in an automobile accident while she was a passenger in a car driven by her friend. Id. at 409, 710 A.2d at 413. The plaintiff's personal auto policy contained UIM coverage with a $100,000 limit. Ibid. The UIM limit of the driver's personal auto policy was $250,000. Ibid. Both policies exceeded the liability limit of the tortfeasor's policy. Ibid. When the plaintiff submitted claims for UIM coverage to both carriers, the plaintiff's carrier invoked the "other insurance" clause of its policy and declared that its policy would be excess to the driver's carrier. Id. at 410, 710 A.2d at 414.
The issues presented to the Court were: (1) the total amount of UIM coverage to which the plaintiff was entitled; (2) whether the anti-stacking provisions of N.J.S.A. 17:28-1.1c limited the amount of UIM coverage available to the plaintiff; and (3) the respective liability of the UIM carriers for payment of UIM benefits to the plaintiff. Id. at 412, 710 A.2d at 415.
The Court ruled that since the plaintiff was a permissive passenger, the driver's policy was "held" by the plaintiff and its UIM limit of $250,000 was available to the plaintiff. Id. at 416, 710 A.2d at 417. The Court found that the plain language of the "other insurance" clause in the plaintiff's policy clearly established that the UIM coverage in the driver's policy was primary, and the UIM coverage in the plaintiff's policy was excess. Ibid. That the plaintiff had "purchased only $100,000 of UIM coverage under her personal policy does not affect her right to recover the higher limit of UIM coverage to which she was expressly entitled under the [driver's] policy." Id. at 418, 710 A.2d at 418.
The Court also ruled that the anti-stacking provision contained in N.J.S.A. 17:28-1.1c unmistakably limited the plaintiff's UIM recovery to the highest limit available under any one of the policies available to that claimant, irrespective of whether *146 any available carrier is primary or excess. Id. at 421, 710 A.2d at 420.
In noting, however, that carriers may limit the amount of UIM coverage contained in their policies by insertion of step-down coverage clauses, the Court stated:
We also observe, as we did in French, supra, 149 N.J. at 494, 694 A.2d [at 1016]..., that insurers can modify policy language in an effort to address issues of UIM coverage and liability. The standard form of the 1996 insurance agreement on file with the Department of Insurance provides that if an insured is not a named insured under the policy in question but is a named insured under her own policy, then the limit of liability under the subject policy will not exceed the highest applicable limit of liability coverage under the named insured's policy. If included in the [driver's] policy, that language apparently would limit [the plaintiff's] recovery under that policy to the amount of UIM coverage provided by [her] policy.

[Id. at 418, 710 A.2d at 418 (emphasis added).]
Following the reasoning of the Court in Magnifico, if the driver's policy therein had contained the 1996 step-down clausewhich was, indeed, a part of NJM's policy herethe amount of UIM coverage that the plaintiff in Magnifico could have recovered would have been "limited" to the amount contained in her personal auto policy, and the UIM coverage limit in the driver's policy would not have applied.
Here, Magnifico's tacit approval of the same standard step-down clause that is contained in NJM's policy supports our conclusion that plaintiff's UIM recovery is limited to $100,000, the UIM limit contained in his personal auto policy. Under the clear and unambiguous language of the step-down clause in the UM/UIM endorsement of NJM's policy, the most NJM would be required to pay to someone who was not a "named insured" under its policy but was a "named insured" under another policy was "the highest applicable limit of insurance under any coverage ... to that insured as an individual named insured." Here, the highest applicable UIM limit under the only policy where plaintiff was identified as a named insuredhis ownwas $100,000. Therefore, it follows that this was the most plaintiff was entitled to recover, assuming he was actually "underinsured."
In New Jersey Mfrs. Ins. Co. v. Breen, 153 N.J. 424, 710 A.2d 421 (1998), the primary issue concerned the right of a "family member" of "named insureds" under a business auto policy to receive UIM coverage under the business auto policy when the family member was injured in an accident while operating her own vehicle. Id. at 425, 710 A.2d at 421-22. The defendant family member's UIM coverage under her own personal policy was $50,000. Id. at 425-26, 710 A.2d 421-22. The tortfeasor's liability limit was $100,000. Id. at 426, 710 A.2d at 422. The defendant lived with her parents whose business auto policy carried $500,000 in UIM coverage. Ibid. Although the parties disputed whether the family member had been employed by her parents' company, the business auto policy expressly applied to family members of the "named insured." Ibid. There, the named insureds were the family member's parents and the company. Ibid.
In holding that the UIM coverage contained in the business auto policy applied to the plaintiff, the Court iterated its conclusion in French that "the critical factor in UIM coverage litigation is the policy language." Id. at 431, 710 A.2d at 424. Regardless of whether the family member was an actual employee of her parents' company, the Court held that its policy *147 applied to her because it applied to the named insureds or any family member of the named insureds. Ibid. Under the business auto policy the Court found that the family member thus "held" the policy as that term is used in N.J.S.A. 17:28-1.1(e). Ibid. As in French, however, the Court emphasized that insurance companies could attempt to address issues of UIM coverage by modifications of policy language, stating in pertinent part:
Under the standard form of the 1996 insurance agreement on file with the Department of Insurance, a vehicle is not considered underinsured with respect to a person not named as an insured under the policy in question but named as an insured under her own policy, unless the liability limit under her own policy exceeds that of the tortfeasor's vehicle. Under that formulation the tortfeasor's vehicle in this appeal would not have been underinsured with respect to [the defendant family member].
[Id. at 432, 710 A.2d at 425.]
Here, the Court's putative approval in Breen of that portion of the standard-policy definition of an "underinsured motor vehicle"the same definition contained in NJM's policy heresupports our conclusion that plaintiff was not "underinsured." That definition would render plaintiff here underinsured only if the tortfeasor's liability limit was less than the highest applicable limit of UIM coverage under any policy naming plaintiff as an individual named insured. Inasmuch as Trotter's $300,000 liability limit exceeded the $100,000 UIM per person limit under the only policy that identified plaintiff as a named insuredhis ownhe was not "underinsured." Therefore, plaintiff had no valid claim to the $1 million in UIM coverage under NJM's policy.
The same step-down clause in NJM's policy in this case has been deemed, on its face, valid and compatible with N.J.S.A. 17:28-1.1. See Botti, supra, 361 N.J.Super. at 222-23, 824 A.2d at 1122-23; Christafano, supra, 361 N.J.Super. at 235-36, 824 A.2d at 1130-31.
In Botti, supra, the plaintiff was seriously injured when, while operating a Jeep owned by his employer, an unidentified vehicle forced him off the road. 361 N.J.Super. at 221-22, 824 A.2d at 1122-23. The plaintiff's employer had authorized plaintiff to take the Jeep home on a regular basis for personal and business purposes. Id. at 222, 824 A.2d at 1123. In exchange, the plaintiff paid his employer $15 per week, which was deducted from his paycheck, to help cover the cost of the insurance. Ibid.
The employer and two related corporations were the "named insureds" on their business auto policy. Ibid. In addition, the business auto policy provided that anyone occupying a covered auto was deemed an "insured" for purposes of UM coverage. Ibid. The Jeep involved in the accident was also identified on the policy. Ibid. Therefore, the plaintiff was considered to be an "insured" under the business auto policy because he was occupying a covered auto at the time of the accident. Ibid. The business auto policy's UM/UIM endorsement contained the same step-down clause as NJM's policy here. Id. at 222-23, 824 A.2d at 1123-24.
In Botti, the policy's UM coverage was $1 million. Id. at 222, 824 A.2d at 1123. The plaintiff and his wife were named insureds under a personal automobile policy with UM coverage of $100,000. Id. at 223, 824 A.2d at 1123.
The plaintiff sought UM coverage under the CNA business auto policy. Ibid. The business auto carrier claimed that the plaintiff's coverage was limited to *148 $100,000 pursuant to the explicit terms of the step-down clause in its policy. Ibid.
In the ensuing declaratory judgment action, on the plaintiff's motion for summary judgment, the parties stipulated that the plaintiff was an "insured" entitled to coverage under the business auto policy. Ibid. The plaintiff argued that the step-down clause did not apply because he was actually a "named insured" by virtue of his status as an employee who was entitled to use the Jeep for business and personal reasons. Ibid. Moreover, because the business auto policy did not name any individuals on the UM endorsement, the plaintiff contended that the employer must have intended that all its employees be considered as "named insureds." Ibid.
The Botti trial court concluded that the plaintiff was a "named insured" under the business auto policy because he was an employee who had exclusive use of the Jeep. Ibid. Therefore, the court found that the step-down clause did not apply to plaintiff and he was granted summary judgment. Ibid. We reversed. Id. at 228, 824 A.2d at 1126.
We ruled that the standard UM/UIM endorsement in the employer's business automobile policy with its step-down coverage limitation clause was not ambiguous on its face. Id. at 226, 824 A.2d at 1125. Indeed, we held that the step-down provision was valid and enforceable. Id. at 224, 824 A.2d at 1124. We found no factual or legal support for the plaintiff's assertion that he was a "named insured" under the business auto policy. Ibid. In so ruling, we carefully distinguished the meaning of "named insured" from that of "insured." Id. at 226, 824 A.2d at 1125. We observed that, typically, the declarations page of a policy contains the term "named insured" "followed by specific names of either a natural person or any legally cognizable entity." Ibid. Recognizing that a legal business entity cannot have relatives or family members, we nevertheless observed that "the term `named insured' is self-defining" and "refers only to the names so appearing in the declaration." Ibid. An "insured," on the other hand, "is anyone who is entitled to coverage." Ibid.
The policy at issue in Botti stated that the "named insureds" were the employer and two corporate affiliates. Ibid. Nothing suggested that anyone else was a named insured. Ibid. We concluded that the fact that the named insureds were corporations did not render the policy language ambiguous. Ibid. We rejected the plaintiff's claim that, because a corporation cannot sustain a personal injury, the UM coverage was illusory, stating in pertinent part:
First, we note that the UM endorsement provides coverage for bodily injury and/or property damage. Second, the UM endorsement does not limit coverage to the "named insureds." In addition to the "named insureds," coverage is afforded to "anyone occupying a covered `auto,' or a temporary substitute for a covered `auto.'" We further note that the [business auto] policy covered many `autos,' the Jeep being number thirty-eight. Therefore, many individuals were potential UM claimants under the [business auto] policy. Each potential claimant could receive up to $1 million in UM coverage unless the claimant was a "named insured" in another policy providing lower UM coverage. In the latter case, the claimant would still receive a maximum UM coverage equal to that set by the claimant's policy. This hardly constitutes illusory coverage.
[Botti, supra, 361 N.J.Super. at 226-27, 824 A.2d at 1125.]
We also concluded that the plaintiff "could not have had an objectively reasonable expectation of being a named insured *149 in the [business auto] policy." Id. at 227, 824 A.2d at 1125-26. We recognized, however, that a reasonable expectation of coverage can overcome even the plain meaning of a policy and, further, that an insured who has a reasonable belief that he or she has purchased certain coverage will not be denied that coverage if boilerplate language negates it. Ibid. Nevertheless,
[t]hat very sound principle ... cannot help an insured who makes a choice about coverage and later that choice turns out to have been improvident. Here, Botti's name could have been added as a "named insured" in the UM endorsement. This might have affected the amount of the policy premium, but as Botti concedes, in the personal injury protection and Drive Other Car endorsements of the [business auto] policy, other... employees were added as additional insureds.
We also note that neither the declaration pages of the policy nor of the UM endorsement created any expectation of coverage which was limited by other provisions of the policy. The provisions of the step down clause itself are clear and unambiguous. There is no challenge that the language used by the drafter is capable of different construction. The only challenge is that the drafter could not have intended for a corporate entity, or entities, to be the sole "named insured." We have already addressed that argument.
Accordingly, because neither the step-down clause nor the term "named insured" are ambiguous, the limitation on insurance must be enforced against Botti as written.
[Id. at 227-28, 824 A.2d at 1126 (citations omitted).]
Although the Botti case involved a claim for UM rather than UIM coverage, the issue is the same, since the step-down clause applies to both forms of coverage. Like plaintiff here, the plaintiff in Botti was not a "named insured" on the policy. However, the plaintiff in Botti, like this plaintiff, was an "insured" because he was occupying a covered auto at the time of the accident.
Similarly, the business auto policy in Botti did not identify an individual as a named insured, just as NJM's policy in this case named only the business entities of Vogel and Holgate. Here, the NJM business auto policylike the business auto policy in Botticannot be considered to have provided illusory UIM coverage because plaintiff, and anyone else who was involved in an automobile accident while occupying a Vogel or Holgate vehicle, was an "insured" and thereby entitled to UIM coverage if they were not a "named insured" on any other auto insurance policy.
An analysis of Christafano, supra, yields the same conclusion. There, the plaintiff was severely injured when he was forced off the road by an unidentified vehicle. 361 N.J.Super. at 231, 824 A.2d at 1128. The plaintiff was insured for UM benefits under three different policies. Ibid. Under his personal auto policy the plaintiff had $25,000 in UM coverage. Ibid. He also was insured for $100,000 in UM coverage as a "family member" by a personal auto policy that had been issued to his sister, and for $300,000 in UM coverage under a personal auto policy that had been issued to his mother. Ibid. The plaintiff demanded that each of these companies pay their prorated share of the highest available UM limit. Id. at 231-32, 824 A.2d at 1128-29.
The mother's carrier declined coverage, claiming that the step-down coverage clause contained in the UM/UIM endorsement to its policy limited the plaintiff's coverage to the $25,000 UM coverage provided *150 in his personal auto policy, prorated among the three carriers. Id. at 232, 824 A.2d at 1128-29.
On the plaintiff's order to show cause, the motion judge ordered the defendant to arbitrate the UM claim and declared the maximum UM exposure of the mother's carrier, on a prorated basis, to be $211,500 based upon maximum available coverage of $300,000. Id. at 233, 824 A.2d at 1129. The motion judge found that the step-down provision was ambiguous because it was "subject to an interpretation that the exclusionary provision ... is not applicable to the instant situation wherein the other insurance provides coverage to the other person, the plaintiff ... as a direct named insured in the amount of $25,000." Ibid.
In reversing, we concluded that the step-down clause limiting coverage was
clear and unambiguous and limits [the mother's carrier's] UM coverage to that afforded by [the plaintiff's carrier's] policy because the three enumerated conditions [of the step-down clause] are met. Namely, plaintiff is not the named insured under the [mother's] policy, but is a named insured under [his personal auto] policy, which provides UM coverage with lesser limits of liability than the [mother's] policy.
[Id. at 235, 824 A.2d at 1131.]
We are persuaded by the rationale in Christafano. The correct provision of the policy that was applicable therealthough worded slightly differentlyis the same as the provision applicable here. Here, plaintifflike the plaintiff in Christafanowas a named insured under his personal auto policy. Like the plaintiff in Christafano, who could not assert a UM claim against the defendant's policy, the plaintiff here cannot assert a UIM claim against NJM's $1 million UIM policy limit because NJM's liability cannot exceed the highest applicable limit under the policy in which plaintiff is a named insured. Here, plaintiff's personal auto policy with Liberty Mutual has a maximum UIM limit of $100,000 per person.
We also conclude that our holdings in Botti and Christafano are not contrary to our rulings in Araya and Macchi. In Araya, supra, 353 N.J.Super. at 206, 801 A.2d at 1196, the plaintiff appealed a summary judgment order dismissing his declaratory judgment action seeking UIM coverage under his employer's business auto policy. The plaintiff was employed as a landscaper by Mahon Landscaping, a sole proprietorship owned by Christopher Mahon (Mahon). Ibid. While trimming someone's lawn, the plaintiff was struck from behind by a car and seriously injured. Ibid.
The plaintiff sued the driver who hit him but settled the case for $100,000, which was the liability limit of the driver's auto insurance policy. Ibid. The plaintiff then made a claim for UIM coverage under his employer's policy, which carried a $500,000 policy limit. Ibid. The employer's business auto carrier denied coverage on the ground that the plaintiff was not an "insured" under its policy. Ibid. According to the business auto carrier, the policy had been issued to Mahon personally. Ibid. The motion judge agreed. Ibid.
On appeal, we determined that the issue of coverage turned on whether the "named insured" was Mahon personally or his business. Ibid. Although we found that the named insured in the policy was the business, the plaintiff was nevertheless entitled to UIM coverage pursuant to our holding in Cook-Sauvageau. Id. at 207, 801 A.2d at 1196-97.
Although the policy identified Mahon and his business as the named insureds, id. at 208, 801 A.2d at 1197, we ruled that the only named insured was the business because of the facts surrounding the issuance *151 of the policy. Id. at 208-09, 801 A.2d at 1197-98. When the business auto carrier sold the commercial policy to the business, the agent had provided premium quotes that included UIM coverage for each of the business's vehicles. Id. at 207, 801 A.2d at 1196-97. The agent knew that Mahon had personal insurance policies, and he believed that the vehicles covered under the business policy would only be used in connection with the landscaping business. Id. at 207-08, 801 A.2d at 1196-97. In addition, Mahon, Rafael A. Rojas, and the plaintiff were listed as covered drivers. Ibid. That had been done at Mahon's direction because "he wanted them to be covered to the same extent that he was himself." Id. at 208-09, 801 A.2d at 1197-98. It was Mahon's intention to include Rojas and the plaintiff as named insureds under the policy, and the defendant had never explained to Mahon that he (Mahon) was covered in more situations than his employees under the policy. Id. at 209, 801 A.2d at 1198. Thus, there was nothing about the policy that would have alerted anyone to the fact that it was intended to only provide personal coverage to Mahon. Ibid.
The UM/UIM endorsement to the policy in Araya did not expressly apply to the plaintiff because he was a pedestrian at the time of the accident. Ibid. Nevertheless, we "construe[d] this automobile insurance policy consistent with the insured's reasonable expectations of coverage." Ibid. Citing to Lehrhoff v. Aetna Cas. & Sur. Co., 271 N.J.Super. 340, 346-47, 638 A.2d 889, 892 (App.Div.1994), we noted that the declarations page of an insurance policy was "the best indicator of what an insured's reasonable expectations should be." Araya, supra, 353 N.J.Super. at 209, 801 A.2d 1194. Specifically, "`reasonable expectations of coverage raised in the declaration page cannot be contradicted by the policy's boilerplate unless the declaration page itself so warns the insured.'" Id. at 210, 801 A.2d at 1198 (quoting Lehrhoff, supra, 271 N.J.Super. at 347, 638 A.2d at 892; alteration in original). We continued:
The only reference in the Declarations Page as to who can reasonably expect to be a covered individual for UIM purposes as an agent for the named insured is the list of included drivers. This is the only rational interpretation of the ambiguous language used in the UIM endorsement.
Thus, if defendant's position as to UIM coverage is accepted here it would be reminiscent of the no-win scenario described by Judge Baime in Owens-Illinois, Inc. v. United Ins. Co., 264 N.J.Super. 460, 491[, 625 A.2d 1, 16-17]... (App.Div.1993), as "the unholy mantra" of "we collect premiums: we do not pay claims."

[Ibid.]
In Araya, we deemed the policy ambiguous because the defendant had failed "to designate a natural person or persons entitled to UIM coverage under the policy." Id. at 210-11, 801 A.2d at 1199. We noted that clearer drafting could have put the ambiguity "`beyond reasonable question.'" Id. at 211, 801 A.2d at 1199 (quoting Progressive Cas. Ins. Co. v. Hurley, 166 N.J. 260, 274, 765 A.2d 195, 202 (2001)). We concluded, as follows:
Here the drafters could have easily and unambiguously identified the named insured. If Mahon as an individual was the intended insured, the policy should not have included any reference to the business entity and should have clearly identified Mahon as an individual by including the words "individually" or "personally." Conversely, if the business entity is the insured, the employees entitled *152 to UIM coverage should also be clearly identified.

We hold that when a business auto policy fails to designate the insured business entity's human agent or agents entitled to receive UIM benefits, we will look to the Declarations Page as to the best indicator of the insured's reasonable expectations of coverage. Any ambiguity created by boilerplate provisions found elsewhere in the policy will be resolved against the drafters of the policy and in favor of coverage. In this case, the covered drivers listed in the Declarations Page provide the best indication of who is to receive UIM benefits.

There is no question under this analysis that plaintiff is entitled to UIM benefits as if he were a named insured. His rights derive from the issuing of the policy to a business entity and his designation as a covered driver. Therefore, plaintiff is entitled to recover UIM benefits under this policy.

[Ibid. (emphasis added).]
Araya is distinguishable and, therefore, inapplicable here for several reasons. As NJM correctly points out, the plaintiff in Araya was specifically listed on the policy as a covered driver, and his employer intended for him to be covered as a named insured.
Here, the name of no natural person was listed on NJM's policy, and Vogel had no intention of providing UIM coverage for its employees. Because no individual was identified here as either a named insured or as a covered driver, plaintiff could not have had a reasonable expectation of coverage. In the absence of any individual's name on the declarations page of NJM's policy, the "boilerplate" language in the UIM provision did not render the policy ambiguous.
In Macchi, supra, 354 N.J.Super. at 68, 804 A.2d at 598, the plaintiff, who had stopped and gotten out of her car to assist the driver of an overturned vehicle, was severely injured when a third car struck the disabled car she was standing next to, causing the disabled vehicle to spin around and hit her. At the time of the accident, the plaintiff and her husband were separated. Ibid.
The plaintiff had been driving a Corvette, which was considered to be her car even though it was owned by either the plaintiff's husband or his business. Id. at 68-69, 804 A.2d at 598-99. The plaintiff drove the car daily, using it to commute to her job in Pennsylvania, among other things. Id. at 69, 804 A.2d at 599. The Corvette was one of four cars insured under a business auto policy. Ibid. That policy provided $1 million in UM/UIM coverage on the Corvette. Ibid. The UM/UIM coverage endorsement was the same as that contained here in NJM's policy. Ibid.
The plaintiff's husband also had a separate, personal automobile policy that insured a fifth vehicle, which he owned personally. Ibid. That policy provided UM/UIM coverage up to $100,000. Ibid. Although the husband was the only "named insured" on his policy, it also insured any "family member" of a named insured, which was defined to mean "a person related to you by blood, marriage or adoption who is a resident in your household[.]" Ibid.
The plaintiff sued the drivers of the overturned vehicle and the vehicle that had struck the overturned vehicle. Id. at 70, 804 A.2d at 599-600. The driver of the overturned vehicle was uninsured, and the driver who had caused the accident had $100,000 in liability coverage. Ibid. The plaintiff settled her claim against that driver for $80,000 and demanded arbitration of her UM and UIM claims against the business *153 automobile policy. Ibid. After reading the transcript from the plaintiff's deposition, which had been taken in preparation for the arbitration, counsel for the business carrier notified the plaintiff's counsel that the business auto carrier was declining coverage on the ground that the plaintiff did not meet the policy's definition of "occupying" the Corvette at the time of the accident. Ibid. Accordingly, the business auto carrier refused to proceed with the arbitration, and the plaintiff filed suit. Ibid.
On cross-motions for summary judgment, the trial court initially ruled in the plaintiff's favor, having determined as a matter of law that the plaintiff had been occupying the Corvette at the time of the accident and was, therefore, covered by the policy. Id. at 67, 804 A.2d at 597-98. On the business auto carrier's motion for reconsideration, the trial court reversed its determination and found that the plaintiff had not been occupying the vehicle at the time of the accident. Ibid. However, the trial court ruled that the plaintiff was still entitled to coverage because the delay of the business auto carrier in refusing coverage estopped it from denying her entitlement to recover. Ibid. Nevertheless, the court ruled that plaintiff's recovery was limited to $100,000 under the "step-down" coverage limitation clause of the policy. Ibid.
Both parties appealed portions of the order. Ibid. The plaintiff challenged the trial court's repudiation of its initial holding that the plaintiff had been occupying the vehicle, as well as the court's ruling on reconsideration that the plaintiff's recovery was limited by the step-down clause; the business auto carrier appealed the court's estoppel determination. Ibid. We affirmed the order as it pertained to coverage but reversed as to the applicability of the step-down clause. Id. at 76, 804 A.2d at 603-04.
Although not relevant to this appeal, we first decided that the plaintiff had indeed been occupying the Corvette at the time of the accident. Id. at 72, 804 A.2d at 601. Thus, the judgment declaring coverage was affirmed. Ibid. On the issue of application of the step-down provision, the trial court had found that the plaintiff was "`an insured who is not the individual named insured under the ... policy.'" Ibid. The trial court considered the plaintiff a named insured under her estranged husband's personal auto policy, which had the $100,000 limit. Ibid. Therefore, the trial court reasoned, the most that the business auto carrier would have had to have paid under the plaintiff's UIM claim was $100,000. Id. at 72-73, 804 A.2d at 601-02.
We disagreed with the trial court's essential premise that the plaintiff was "`an insured who is not the individual named insured under the [business auto] policy.'" Id. at 73, 804 A.2d at 601. We noted that the business auto policy provided coverage "for four motor vehicles including the 1997 Chevrolet Corvette assigned by the owner to plaintiff for her use." Ibid. The business was located in Trenton. Id. at 69, 804 A.2d at 599. The policy identified three of the vehicles that were being used in the business as being garaged at the location of the business in Ewing. Id. at 73, 804 A.2d at 602. However, the Corvette was described in the policy as being garaged in Yardley, Pennsylvania. Ibid. The declarations page expressly stated that the Corvette was subject to the $1 million UM/UIM policy limits. Ibid.
Before turning to an interpretation of the policy, we "[began] with the understanding that plaintiff is for all intents and purposes an individual named insured under [the] policy." Id. at 74, 804 A.2d at 603. We explained:

*154 If it were otherwise, i.e., if the only individual named insured were deemed to be [the business], then no claim of the full extent of the personal injury benefit provided by the policy's UM/UIM provisions would ever be possible, because an entity cannot suffer the predicate personal injury. That construction would render illusory the term of the policy establishing a $1,000,000 UM/UIM limit.
[Id. at 74-75, 804 A.2d at 603.]
Other "common sense reasons" dictated our conclusion that the plaintiff was a "named insured" under the business auto policy. Id. at 75, 804 A.2d at 603. The plaintiff was "not merely a permissive, occasional, or errand-specific user of the insured vehicle." Ibid. Instead, she was "the designated primary user of the insured vehicle and must thusly be seen to be covered as a direct insured." Ibid. In addition, we stated:
Our experience suggests that it is not uncommon for businesses to include the personal vehicles of company principals and their families within the coverage of business auto insurance policies. Thus, it is fair to consider the carrier to be on sufficient notice to be required to express any limitations in coverage with greater precision than was employed here, especially where it is clear on the face of the policy that the vehicle at issue, here a Corvette, is a personal-use automobile and is garaged at a location other than the place where the other vehicles insured under the business auto insurance policy are kept.

[Ibid.]
In Macchi, we iterated our rationale in Araya by quoting the part of the Araya opinion where we looked to the policy's declarations page "`as the best indicator of the insured's reasonable expectations of coverage'" when the policy fails to designate a human entitled to receive UIM benefits. Id. at 76, 804 A.2d at 604 (quoting Araya, supra, 353 N.J.Super. at 211, 801 A.2d at 1199). Thus, the language of the policy dictated our "hold[ing] that plaintiff was an insured under the [business auto] policy, driving a covered vehicle, and therefore entitled to the full extent of that policy's UM/UIM coverage undiminished by the unmet conditions of the policy's `step-down' provisions." Macchi, supra, 354 N.J.Super. at 76, 804 A.2d at 603.
Macchi also is distinguishable from the facts of this case. There, the Corvette simply could not have been considered a business auto even though it was insured under a business auto policy. The language of the business auto policy, specifically the declarations page, dictated the result. The vehicle was clearly the plaintiff's car; had been used only by her for personal matters; and it was garaged at a location different from the location of the business.
Our conclusion in Macchi that the plaintiff was a "named insured" was based upon the reality that to conclude otherwise would render the UIM coverage illusory as it pertained to the plaintiff. In actuality, the UIM coverage was not illusory simply because the business auto policy did not designate a natural person as a named insured. It was only illusory as to the plaintiff, who would have been left without any UIM coverage.
Recently, in Dickson v. Selective Ins. Group, 363 N.J.Super. 344, 833 A.2d 66 (App.Div.2003), we addressed the issue of UIM "coverage by a shareholder of an insured corporation whose business vehicle was not involved in the accident occurring when the vehicle plaintiff was riding in was hit by a third party." Id. at 345, 833 A.2d at 66-67. There, the plaintiff had no personal auto policy and only drove a vehicle leased for his use by the corporation that was insured under a business auto policy. *155 Id. at 346, 833 A.2d at 67. However, the business-leased vehicle was not involved in the auto accident, nor was the plaintiff listed as a named insured under the business auto policy. Id. at 346-47, 833 A.2d at 67. We rejected the trial court's application of Macchi and Araya to find that the plaintiff was entitled to UIM coverage under the business auto policy. Id. at 352, 833 A.2d at 71. We concluded that the plaintiff's claim for UIM coverage had no relation to the business auto policy or the business its policy insured "because plaintiff was admittedly neither specifically named in the policy nor personally listed in any endorsement, ... and he was not riding in a business owned or covered vehicle." Ibid.
Here, we also distinguish Macchi and Araya, and conclude that plaintiff could not look to NJM's business auto policy to recover $1 million in UIM benefits because, under the clear and unambiguous language of the step-down clause in the UM/UIM endorsement, the most plaintiff could obtainif he were underinsuredwas $100,000. As a result, plaintiff was not an underinsured motorist because his personal auto policy's UIM coverage did not exceed the tortfeasor's $300,000 liability limit.
The order granting summary judgment in favor of plaintiff is reversed and the matter is remanded to the Law Division for entry of summary judgment in favor of NJM.